UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Steven W. Mattson,

                Plaintiff,

v.

Becker County, Minnesota;
Timothy Haverkamp, individually
and in his capacity as Becker
County Deputy Sheriff,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 07-1788 ADM/RLE

_____

Hannah R. Stein, Esq., Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, on behalf of Plaintiff.

Jason M. Hiveley, Esq., Iverson Reuvers, Bloomington, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On May 7, 2008, the undersigned United States District Judge heard oral argument on Defendants Becker County (the "County") and Becker County Deputy Sheriff Timothy Haverkamp's ("Haverkamp") Motion for Summary Judgment [Docket No. 12]. Defendants' Motion is granted in part and denied in part.

## II. BACKGROUND[1]

Either late in the evening of September 14, 2006, or early in the morning of September 15, 2006, Plaintiff Steven W. Mattson ("Mattson") left the home of his friend Michele Dinkel ("Michele") in Lake Park, Minnesota. Mattson Dep. (Stein Aff. [Docket No. 18] Ex. A) at 15.

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Mattson was at Michele's home to meet with friends and to deliver a chainsaw for Michele's son Michael Dinkel ("Michael"). Id. at 14. Mattson had driven westbound on Highway 9 for about two blocks when a vehicle with its brights on passed him in the opposite lane. Id. at 12. Because the vehicle had its brights on, Mattson focused on the fog line (the white line marking the right shoulder of the road) to avoid drifting into the opposite lane. Id. at 67. Mattson avers he never crossed into the opposite lane nor did he cross the fog line. Id. at 67-68. After Mattson passed the vehicle with its brights on, he realized he had forgotten to leave the chainsaw for Michael. Id. at 12. Mattson then turned on his left-turn signal, turned left towards Michele's house, drove around the block, and pulled into a driveway adjacent to Michele's lot. Id. at 16-17.

While Mattson was driving on Highway 9, Haverkamp began following Mattson in his squad car. Haverkamp Dep. (Stein Aff. Ex. D) at 21-22. Although Haverkamp testified he did not have his brights on, he agrees that he passed Mattson while driving eastbound on Highway 9. Id. According to Haverkamp, Mattson swerved and crossed the fog line and then drifted over the centerline into Haverkamp's eastbound lane. Id. at 22-23. Haverkamp followed Mattson for a short period of time until he was within a block and a half of Mattson's vehicle. Id. at 26. Haverkamp then radioed dispatch and attempted to activate his lights, sirens, and dashboard camera. Id.

It is undisputed that the lights and sirens in Haverkamp's squad car did not activate. Haverkamp has offered inconsistent statements regarding whether he knew his lights and sirens failed to activate. In his police report, Haverkamp stated he was immediately aware his lights and sirens did not activate because he heard a "slight (POP) from the engine compartment,"

2

indicating that a fuse had blown. Haverkamp Report (Stein Aff. Ex. E). However, while transporting Mattson to the Becker County jail Mattson asked Haverkamp whether his lights and sirens had been on, to which Haverkamp replied, "Yeah. Actually, I did have my lights on." Transcript of Squad Car Audio ("Transcript") (Hiveley Aff. [Docket No. 14] Ex. D) at 24. Further, Haverkamp testified during his deposition that he was not aware that his lights and sirens failed to activate despite having had his window open and agreeing he would normally be able to see his lights and hear his sirens. Haverkamp Dep. at 27-28. Haverkamp never signaled for Mattson to pull over and Mattson was not aware Haverkamp was pursuing him. Haverkamp Dep. at 17.

Eventually, Mattson did pull his vehicle into the driveway adjacent to Michele's lot. Id. at 16. Mattson parked so that his lights would shine on the fire pit where he planned to leave the chainsaw for Michael. Id. at 20. When Mattson got out of his vehicle, he heard Haverkamp's tires sliding on the gravel and saw Haverkamp's headlights coming towards him. Id. at 19-20. Because the lights of Haverkamp's squad car were shining directly at Mattson, Mattson did not identify the vehicle as a Becker County Sheriff's squad car. Id. at 22. When the squad car came to a complete stop, Mattson began heading toward Michele's house. Id. at 22-23. As Mattson proceeded toward the house, Haverkamp yelled "Get back. Stop right there or I'll shoot." Transcript at 2. Haverkamp did not identify himself as a deputy sheriff. Id. Mattson continued toward the house and Haverkamp pursued him until he came within range to use his taser on Mattson. Mattson Dep. at 24, 29; Haverkamp Dep. at 52. Havercamp then fired his taser at Mattson's back and Mattson fell to the ground. Mattson Dep. at 31; Haverkamp Dep. at 52; Transcript at 2.

Haverkamp instructed Mattson to get onto his stomach and positioned his knee on Mattson's back in order to restrain him.  Mattson Dep. at 31; Haverkamp Dep. at 52; Transcript at 2.  In response to Haverkamp's orders and physical restraint, Mattson responded by asking "What" and "Why" as Haverkamp continued to order Mattson to get onto his stomach.  Transcript at 2-3.  Haverkamp deployed his taser on Mattson a second time because Mattson continued trying to turn around to face Haverkamp despite Haverkamp's efforts to restrain him.  Haverkamp Dep. at 52; Mattson Dep. at 32.  Haverkamp had not yet identified himself and Mattson was unaware of who had tasered him.  Transcript at 2-3.

After the second use of the taser, Haverkamp handcuffed Mattson and began questioning him about his identity.  Mattson Dep. at 34; Haverkamp Dep. at 54.  Haverkamp stated "Are you Steve . . . What is your name?  I'll dig it out of your billfold."  Transcript at 3.  While Haverkamp removed Mattson's wallet from his pocket, Mattson continued to ask what he was doing and who he was.  Id. at 4.  Haverkamp replied: "You'll know soon enough who I am."  Id.  Haverkamp attempted to return Mattson's wallet to his pants pocket but Mattson asked Haverkamp to instead place the wallet in his hat, which was lying on the ground.  Id.  Mattson turned to face Haverkamp to speak to him, which prompted Haverkamp to order Mattson to turn onto his stomach.  Id.  Haverkamp and Mattson argued back and forth with Haverkamp ordering Mattson to get onto his stomach and Mattson telling Haverkamp to put his wallet in his hat until Haverkamp warned Mattson that if he did not get onto his stomach, Haverkamp was going to tase him again.  Id. at 6-7; Haverkamp Dep. at 58.  Haverkamp then deployed his taser on Mattson a third time.  Transcript at 7; Haverkamp Dep. at 58.

Haverkamp asserts he tased Mattson for the third time because Mattson was attempting to get on his feet and was attempting to kick Haverkamp. Haverkamp Report at 2; Haverkamp Dep. at 58. Mattson, however, disputes Haverkamp's account and instead insists he was not combative, did not make any threatening moves or gestures, did not flail his legs, and did not attempt to kick Haverkamp. Mattson Aff. [Docket No. 19] ¶ 2. Because Haverkamp was unable to place Mattson's wallet in his pocket and did not want to put it in Mattson's hat, he ultimately placed Mattson's wallet in his own pocket. Transcript at 9. Shortly thereafter, Haverkamp transported Mattson to the Becker County Law Enforcement Center. Haverkamp Report.

Haverkamp retained Mattson's wallet until they entered the booking room, when Haverkamp provided it for inventory. Haverkamp Dep. at 66-67. Someone at the Sheriff's department counted the money in Mattson's wallet in front of Haverkamp and Mattson and determined the wallet contained $1,037.16. Transcript at 37. Mattson immediately replied "Where'd the other three go?," implying $300 was missing from his wallet. Mattson testified that he knew $300 was missing from his wallet because he had started the night with fourteen $100 bills and had spent approximately sixty dollars. Mattson Dep. at 40-41. According to Mattson's calculation, at the time of his arrest he should have had thirteen $100 bills and roughly an additional forty dollars in his wallet.

After finishing an inventory of Mattson's possessions, a deputy assisting Haverkamp read Mattson the Minnesota Motor Vehicle Implied Consent Advisory. Transcript at 32. Haverkamp and the deputy notified Mattson that he was under arrest for driving while intoxicated and informed Mattson that he could consult with an attorney before undergoing the breathalyzer test. Id. at 34, 36. Mattson requested to speak with an attorney and was placed in a room with a

5

phone and phonebook so that he could contact one. Id. Mattson eventually received a phone call from his attorney but was not given a private place to conduct his phone conversation. Haverkamp Dep. at 64. Haverkamp remained in the room with Mattson while Mattson spoke to his attorney and could hear Mattson's end of the conversation. Id. at 65. Haverkamp testified that he typically stays in the room with suspects while they speak with their attorneys because he has been trained and instructed to keep in constant visual contact with suspects. Id. He further explained that there is no area in the booking room where a suspect could have a private conversation with an attorney. Id. Mattson's conversation was also recorded pursuant to the County's policy. Id. at 52. Mattson ultimately underwent a breathalyzer test, which indicated his blood alcohol level was 0.11, above the legal limit. Id. at 38.

### III. DISCUSSION

In his Complaint [Docket No. 1], Mattson alleges claims against the County and Haverkamp individually pursuant to 42 U.S.C. § 1983. In count one, Mattson alleges that the County and Haverkamp acted under color of state law to deprive him of his right to be free from excessive force, "his right to freedom from assault and from illegal imprisonment, his right to the effective assistance of counsel and his right to due process, all in violation of the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution."[2] Compl. ¶ 34. Mattson

---

[2] Although Mattson asserted a claim of false imprisonment in violation of § 1983, he did not address it as a claim under the United States Constitution, but under Minnesota law. Accordingly, the Court will not address his claim of false imprisonment in its discussion of his § 1983 claims.

also alleges state law claims of false arrest, interference with his right to counsel, infliction of emotional distress, conversion, and vicarious liability.[3]  Compl. ¶¶ 37-55.

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     42 U.S.C. § 1983 Claims**

Mattson alleges Defendants are liable for violating his right to be free from excessive force, "his right to freedom from assault and from illegal imprisonment, his right to the effective assistance of counsel and his right to due process, [] in violation of the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution."  Compl. ¶ 34.

---

[3] Mattson also pled a claim of abuse of process, however, he did not contest Defendants' Motion for Summary Judgment on that claim and conceded at oral argument that he has abandoned the claim.

**1. Claims against the County**

**a. Attorney-Client Communication**

Mattson claims the County violated his Fourth Amendment right to be free from unreasonable search and seizure by its policy of not providing detainees with a private place to conduct attorney-client communications. Mattson contends the County is liable under Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), which establishes the standard for municipal liability in a § 1983 claim.

Under Monell, municipal liability arises when a constitutional injury directly results from "action pursuant to official municipal policy of some nature." Id. at 691. The policy may derive from an "officially adopted and promulgated" policy by the governmental governing body or from a widespread "custom or usage" within the municipality. Id.; see also Thelma D. ex rel. Delores A. v. Board of Educ., 934 F.2d 929, 932 (8th Cir. 1991). A governmental "custom" may serve as the basis for § 1983 liability "even though such a custom has not received formal approval through the body's official decision making channels." Monell, 436 U.S. at 659; see also Jane Doe "A" v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990). A plaintiff may establish liability "through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality as to constitute a custom or usage with the force of law." McGautha v. Jackson County, Miss. Collections Dept., 36 F.3d 53, 55-56 (8th Cir. 1994) (internal quotations and citations omitted). To demonstrate an unconstitutional "custom," a plaintiff must prove

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that

>misconduct; and (3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Jane Doe "A," 901 F.2d at 646.

Defendants respond the County is not liable under Monell because Mattson has failed to allege a constitutional violation. Defendants assert that Mattson's "Fourth Amendment rights were not violated when his end of the conversation with his attorney was recorded because the call was open and obvious, having been made in front of the officers and [because Mattson] knew it was being recorded." Defs.' Reply Mem. in Support of Mot. for Summ. J. [Docket No. 22] at 3.

In Sherbrooke v. City of Pelican Rapids, 513 F.3d 809 (8th Cir. 2008), the Eighth Circuit addressed a claim that the City's recording of the plaintiff's end of his conversation with his attorney violated his Fourth Amendment right to be free from unreasonable search and seizure. Sherbrooke, like Mattson, had been arrested for driving while intoxicated and had elected to contact his attorney before taking the breath test. Id. at 815. Pursuant to a policy within the Pelican Rapids Police Department, the officers activated audio and video recording equipment to record Sherbrooke as he waited to take the breath test. Id. The recording captured Sherbrooke's end of his conversation with his attorney. Id. The district court held that recording Sherbrooke's conversation constituted an unconstitutional search. Id. The Eighth Circuit reversed, reasoning that because Sherbrooke placed his call in an open room in the presence of police officers, "Sherbrooke could not reasonably expect that the conversation was private, and there was no search within the meaning of the Fourth Amendment." Id. "That communications between an

9

attorney and client generally are privileged when conducted privately does not mean that a conversation knowingly conducted in the presence of others is privileged or private." Id.

The Eighth Circuit's holding in Sherbrooke dictates that Mattson's claim of being subjected to an unconstitutional search and seizure fails and Defendants are granted summary judgment on this claim. Mattson knew that Haverkamp was in the room during his conversation with his attorney and thus could not reasonably expect that his conversation was private. Further, Mattson testified that he knew he was being recorded because the camera was above him in plain view. Mattson Dep. at 52. Accordingly, Mattson was not subjected to an unreasonable search and seizure and his Fourth Amendment rights were not violated.

Mattson also alleges the County violated his Fourteenth Amendment substantive due process rights because the County's policy compromises the fundamental right to counsel provided by the Sixth Amendment. Although Mattson asserts this claim under the Fourteenth Amendment, it is better analyzed under the Sixth Amendment. Albright v. Oliver, 510 U.S. 266, 272 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." (internal quotations omitted)). At the time Mattson spoke with his counsel, his Sixth Amendment right to counsel had not yet attached. Kirby v. Illinois, 406 U.S. 682, 689 (1972) (holding that the Sixth Amendment right to counsel attaches upon the commencement of formal judicial proceedings); see also City of Belle Plaine v. Stradcutter, 568 N.W.2d 545, 547 (Minn. Ct. App. 1997) (discussing State v. Nielsen, 530 N.W.2d 212 (Minn. Ct. App. 1995), and explaining that "the process of chemical testing in a DWI investigation is not a 'critical stage'

upon which the right to counsel attach[es]" because the defendant does not have a choice to refuse testing). Because Mattson's right to counsel had not yet attached, the County did not violate his constitutional rights when Haverkamp remained in the room while Mattson spoke to his attorney or when it recorded Mattson's portion of the conversation.

### b. Inadequate Training

Mattson claims the County failed to train its deputies in the proper use of the taser weapon, thus resulting in excessive force used against him in violation of his Fourth Amendment rights. A municipality may be liable under § 1983 for inadequate training of police only under the limited circumstances where "the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact." City of Canton v. Harris, 489 U.S. 378, 380. The inquiry in an inadequate training claim is first, whether the training is adequate, and if not, whether the inadequate training can be said to represent city policy. Id. at 389-90. The inadequate training may be said to represent city policy where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. Typically a plaintiff demonstrates a pattern of constitutional violations to prove that the need for more training was obvious; however, the Supreme Court has not foreclosed the possibility that evidence of a single violation of constitutional rights may demonstrate the obvious need for additional training. Id. at 409. Evidence of the single constitutional violation needs to be "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." Id.

Defendants seek summary judgment on this claim because "there is absolutely no evidence of a policy of inadequate training of Deputy Haverkamp or of other sheriff's deputies." Defs.' Mem. in Supp. of Mot. for Summ. J. at 9.  Defendants rely on Haverkamp's testimony of his annual training about the use of his taser weapon.  Id.  Defendants also cite the policies and procedures manual provided to Haverkamp by Becker County Sheriff's Department regarding the use of tasers.  The training materials specify that "[t]he Taser may be used in situations where force is justified to control aggressive and/or combative/noncompliant subjects, thereby reducing the likelihood of injury to officers and subjects."  Haverkamp Aff. [Docket No. 15] Ex. B at 1.  The policy and procedures manual also states that "[t]he Taser shall not be used on restrained individuals unless the actions of the person subject a potential threat of bodily harm to themselves or any other person."  Id. at 3.

Mattson has failed to offer any evidence or case law to support his claim that the training the County provided about taser use is inadequate.  Haverkamp was trained in the use of his taser weapon and the County provided its deputies with a policy and procedures manual regarding taser use.  Haverkamp Aff. Ex. B; Haverkamp Aff. Ex. C at BCS 0140.  Mattson contends that Haverkamp's training was inadequate because "[h]e was never told to limit his taser use, not to taser already-restrained individuals if other less forceful means of controlling the detainee were available, etc."  Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [Docket No. 17] at 29.  However, the policy and procedures manual does limit taser use—the applications section of the manual limits taser use to instances when "force is justified to control aggressive and/or combative/noncompliant subjects, thereby reducing the likelihood of injury to officers and subjects."  Haverkamp Aff. Ex. B at 1.  The policy limits taser use on restrained individuals to

instances when the individual's actions present the threat of harm to themselves or to others. Mattson has not addressed why these limitations and restrictions on taser use are factually or legally inadequate nor does he cite any supportive case law. Further, although Mattson argues the County's training was inadequate because it did not instruct its deputies to use lesser force when possible, he has cited no support for the proposition that there is a duty to do so in the limited instances when taser use is justified. Accordingly, Defendants are granted summary judgment on Mattson's Monell claim against the County for inadequate training.

### 2.     Claims against Haverkamp

Haverkamp asserts he is entitled to summary judgment on Mattson's excessive force claim against him because he is protected by qualified immunity. In Saucier v. Katz, 533 U.S. 194, 200-01 (2001), the Supreme Court clarified the standard courts must apply in conducting the qualified immunity analysis. The first question is whether, taken in the light most favorable to the plaintiff, the facts alleged show the officer's conduct violated a constitutional right. Id. at 201. If the answer to the first question in the qualified immunity analysis is yes, then the second question is whether the constitutional right at issue was clearly established. Id. "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994).

Defendants do not dispute that the Fourth Amendment right to be free from excessive force is clearly established. Rather, they assert they are entitled to summary judgment because Haverkamp's use of force was objectively reasonable and thus did not violate Mattson's

constitutional rights. Mattson asserts that Haverkamp's use of excessive force to effect his arrest violated the Fourth Amendment.[4]

In analyzing an excessive force claim, whether Haverkamp's actions were objectively reasonable in light of the facts and circumstances confronting him must be assessed without regard to his underlying intent or motivation. Id. at 397. To determine whether the force used to effect Mattson's seizure was reasonable under the Fourth Amendment, the Court is required to carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal citation and quotation marks omitted). The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. Courts are to consider all the facts and circumstances of the particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

It is undisputed that Haverkamp's lights and sirens were not activated while he pursued Mattson in his squad car. It is also undisputed that Haverkamp did not identify himself

---

[4] Although Mattson claims Haverkamp violated his rights under the First, Fourth, Sixth, and Fourteenth Amendments, his claim of excessive force should be analyzed under the Fourth Amendment and its reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989) ("*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard" (emphasis in original)).

immediately upon confronting Mattson, or later as the altercation continued, or even when Mattson requested that he do so. Transcript at 2-3. Viewing the facts in the light most favorable to Mattson, Haverkamp knew that his lights and sirens had not activated. Mattson may well not have known that he was being pursued by law enforcement and thus, may have had no intent to flee law enforcement or resist arrest. Accordingly, Haverkamp's conduct was unreasonable. An objectively reasonable officer would have immediately identified himself, especially knowing that the lights and sirens of his vehicle had not activated, and certainly would not have initiated communication with a threat of deadly force.

To determine whether a particular right was clearly established, it must be viewed in a particularized, relevant sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal citation omitted). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Id. at 741. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

Defendants contend that "[i]t simply was not clearly established a known right would be violated by Deputy Haverkamp if, unbeknownst to him, his lights and sirens did not activate, and

15

[Mattson] fled from him purportedly without knowledge he was being pursued by law enforcement." Defs.' Mem. in Supp. of Mot. for Summ. J. at 19.  However, taking the facts in the light most favorable to Mattson, Haverkamp did know that his lights and sirens failed to activate.  A reasonable officer would clearly know that threatening someone with deadly force and using a taser to restrain that person without first identifying oneself as law enforcement is unlawful.  Accordingly, Haverkamp is not entitled to qualified immunity and Defendants are not entitled to summary judgment on Mattson's excessive force claim against Haverkamp.

**C.     False Arrest**

Mattson alleges a claim of false arrest.  "The action for the tort of false imprisonment or false arrest protects the personal interest in freedom from restraint of movement  The restraint may be imposed by the assertion of legal authority, and if an arrest is made without proper legal authority, it is a false arrest . . . ." Lundeen v. Renteria, 224 N.W.2d 132, 135 (Minn. 1974). Defendants contend they are entitled to summary judgment on this claim because Mattson was arrested for driving while impaired, fleeing in his vehicle, and disorderly conduct.  Defendants contend the arrest "was lawful given [Mattson's] driving behavior, his failure to follow simple commands to 'stop' and 'get on your stomach' and his blood alcohol content of .11." Defs.' Mem. in Supp. of Mot. for Summ. J. at 21.  Mattson argues "Haverkamp's improper pursuit, his failure to identify himself even after Mattson asked who he was, and the admission by Haverkamp that Mattson was stopped for 'fleeing' at least give rise to genuine issues of material fact as to Mattson's claim of unlawful arrest."

At the time of Mattson's arrest, Haverkamp told him he was under arrest for fleeing. There is no evidence of record in light of Haverkamp's admissions that the lights and sirens in

his squad car did not activate that support probable cause for arresting Mattson for fleeing. Accordingly, Mattson's arrest was made without proper legal authority. The post-arrest breath test may support a later arrest for driving while impaired. However, it is the initial basis for arrest that the Court uses to determine Mattson's false arrest claim. Because there is no legal authority to support arresting Mattson for fleeing, Defendants are not entitled to summary judgment on this claim.

### D.     Interference with Right to Counsel

In count three of his Complaint, Mattson also alleges a claim of interference with his right to counsel. Mattson asserts that "Defendants' intentional act of listening and/or taping of Mattson's telephone conversation with his attorney, while in custody at the Becker County Law Enforcement Center, was a violation of the Fourth Amendment to the United States Constitution." This claim is duplicative of Mattson's § 1983 claim based on the failure to provide him with a private place to speak with his attorney. For the reasons stated above, Defendants' Motion for Summary Judgment on this claim is granted.

### E.     Negligent Infliction of Emotional Distress

Mattson contends that as a result of Haverkamp's actions, he suffered "damages, including injury, pain and suffering, mental and emotional anguish, humiliation and pecuniary loss." Compl. ¶ 50. "To establish a claim for negligent infliction of emotional distress, a plaintiff must ordinarily show she (1) was within a zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations." Stead-Bowers v. Langley, 636 N.W.2d 334, 343 (Minn. Ct. App. 2001).

Defendants contend that Mattson has failed to establish a prima facie case of negligent infliction of emotional distress because the only emotional manifestation he experiences is "getting the chills" and a "creepy feeling" when he sees law enforcement. Further, there are no allegations of attendant physical manifestations. Mattson, asserts that he has problems with his wrist and hand, and pain in his elbow and shoulder, for which he has undergone physical therapy. Mattson Dep. at 56-57. Mattson also asserts that he must have a lump removed from the spot on his back where he was tased. Id.

Mattson has failed to allege that his physical injuries are linked to his emotional distress. To the contrary, he testified that his injuries are directly related to Haverkamp's use of force. Id. (stating that being tased while in handcuffs resulted in injuries to his arm, shoulder, elbow, and wrist, and that being shot with the taser caused the lump in his back). Without proof that the he experienced physical manifestations of his emotional distress, Mattson cannot recover under the theory of negligent infliction of emotional distress. Soucek v. Banham, 503 N.W.2d 153, 164 (Minn. Ct. App. 1993) ("Because emotional distress is highly subjective, often transient, and easily alleged, our tort law . . . requires physical manifestation of the distress as proof of the genuineness and gravity of the emotional suffering."). Accordingly, Defendants are entitled to summary judgment on Mattson's claim of negligent infliction of emotional distress.

**F.     Conversion**

In his Complaint, Mattson alleges a claim for conversion. Compl. ¶¶ 51-53. Mattson argues that "Haverkamp's removal of $300.00 from Mattson's wallet and his retention of the same constitute conversion and, as such were done in violation of Minnesota law." Id. ¶ 52. Mattson testified that he knew he had fourteen $100 bills in his wallet because he and a group of

18

three other individuals had been paid that night for extra work they had performed and had divided the payment among the four of them. Mattson Dep. at 40. Despite his testimony that three other individuals were with him when he was paid, Mattson offers no evidence other than his own self-serving statement. This is insufficient to create a genuine issue of material fact. Armour and Co. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993). Accordingly, Defendants are entitled to summary judgment on Mattson's conversion claim.

**G.     Vicarious Liability and Official Immunity**

Because Mattson's claim of false imprisonment survives summary judgment, the next issue is whether Defendants are entitled to official immunity and whether the County may be held vicariously liable for Haverkamp's actions. "[U]nder Minnesota law, a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion. Generally, police officers are classified as discretionary officers entitled to that immunity." Johnson v. Morris, 453 N.W.2d 31, 42 (Minn. 1990) (internal cites omitted); see Maras v. Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993). However, conduct is not immune from liability if the public official "is guilty of a wilful or malicious wrong." Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991). "Malice is 'the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" Samuelson v. City of New Ulm, 455 F.3d 871, 878 (8th Cir. 2006) (quoting Carnes v. St. Paul Union Stockyards Co., 205 N.W. 630, 631 (Minn. 1925)).

Haverkamp was performing a discretionary act when he stopped and restrained Mattson. See Wiederhold v. City of Minneapolis, 581 N.W.2d 312, 315 (Minn. 1998) (explaining that discretionary acts are those involving professional judgment based on the specific "factors of a

situation"). However, Haverkamp is not entitled to official immunity because there is a genuine issue regarding whether he is "guilty of a wilful or malicious wrong." Rico, 472 N.W.2d at 107. Taking the facts in the light most favorable to Mattson, Haverkamp knew his lights and sirens did not activate and knew that he failed to identify himself before threatening Mattson with deadly force and using his taser weapon. Based on these facts a reasonable jury could conclude that Haverkamp acted maliciously. Because Haverkamp is not entitled to official immunity, the County is not protected by the doctrine of vicarious official immunity. See Mumm v. Mornson, 708 N.W.2d 475, 493 (Minn. 2006) (holding that the City of Minneapolis was not entitled to vicarious official immunity because the officers did not have official immunity).

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Becker County and Becker County Deputy Sheriff Timothy Haverkamp's Motion for Summary Judgment [Docket No. 12] is **GRANTED** in part and **DENIED** in part.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 12, 2008.